**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Carolyn Parks, | No. 05-0443-PHX-ROS |
| Plaintiff, | **OPINION AND ORDER** |
| vs. | |
| Jo Anne B. Barnhart, Commissioner of Social Security, | |
| Defendant. | |

Pending before the Court are Plaintiff Carolyn Parks' Motion for Summary Judgment and Defendant Jo Anne B. Barnhart's Cross-Motion for Summary Judgment. Parks seeks a reversal of the Social Security Administration's denial of her request for disability benefits. For the following reasons, Defendant's Cross-Motion for Summary Judgment is granted.

**BACKGROUND**

Carolyn Parks ("Parks") submitted an application for disability insurance benefits on March 20, 2002. (Tr. 88) That application stated that Parks became unable to work on January 1, 1999. (Id.) In her Disability Report, Parks stated that she suffered from "chronic diarrhea & headaches, dizziness & loss of balance, mild stroke, high blood pressure, high cholesterol, sleep apnea, diabetus [sic] type II, chronic fatigue, [and] depression." (Tr. 95) Parks alleges that these conditions prevent her from working because she has "to go to the bathroom as high as 17 times a day with severe cramps" and she is unable to concentrate.

1  (Id.)  Park's was insured for disability through December 31, 1999.  (Tr. 92)  Park's
2  application was denied initially and upon reconsideration.  (Tr. 66-67)  Parks then requested
3  a hearing before an Administrative Law Judge ("ALJ").  (Tr. 78-79)  At the hearing before
4  the ALJ, Parks, a medical expert, and a vocational expert testified.  (Tr. 23-61)  The ALJ
5  found Parks not disabled and the Appeals Council declined to review this decision.  (Tr. 15-
6  21, 6-8)  Parks then filed this action, seeking a determination that she was disabled prior to
7  her date last insured.

8       At the hearing before the ALJ, Parks was the first to testify.  Parks stated that in 1999
9  she suffered from "severe migraines and back problems" and she underwent two abdominal
10 surgeries.  Since 1999 her health had deteriorated such that she now suffers from chronic
11 diarrhea, "[h]igh blood pressure, high cholesterol, sleep apnea, fatigue, dizziness and [is] hard
12 of hearing."  (Tr. 32)  Parks went on to state that she has to take two naps per day and can
13 only work around the house for twenty to thirty minutes before she has to stop and rest.
14 When asked where she has pain Parks replied "Mostly in my head.  I have migraines really
15 bad."  (Tr. 34)  Parks admitted that she can stand for twenty to thirty minutes without having
16 to change position, is able to walk "100 feet or so," can lift a gallon of milk, sitting is only
17 occasionally a problem, she does most of her own shopping, and is currently able to drive.
18 (Tr. 38-44)  When questioned by the ALJ about her symptoms in 1999, Parks stated that
19 during that period she had suffered from migraines and from various symptoms connected
20 to her abdominal troubles.  But Parks admitted that she had started feeling better a short time
21 after her abdominal surgeries.  (Tr. 46)  Parks also admitted that she had suffered from
22 migraines "for years" but stated they had intensified in recent years.[1]  (Tr. 58)

23     Doctor Hershel Goren was the next to testify.  Dr. Goren testified via telephone.  Parks
24 stipulated to Dr. Goren's qualifications and did not raise any objection to Dr. Goren testifying
25 via telephone.  (Tr. 48)  Dr. Goren started by stating that he focused on the period from

---

[1] The record contains evidence that Plaintiff has suffered from "chronic daily
28 headache migraine for 30 years."  (Tr. 367)

- 2 -

1  January 1, 1999 to December 31, 1999. (Id.)  Dr. Goren observed that many of Parks'
2  medical complaints occurred after 1999. (Tr. 48-49)  But he did observe that in 1999 Parks
3  suffered from vertigo, abdominal problems, and had cataract surgery. (Tr. 49)  Dr. Goren
4  concluded that "[f]rom [his] reading of the records [Parks] did not meet or equal any"
5  disability listing in 1999. (Tr. 49)  When asked about the possibility that Parks' later medical
6  problems may have been occurring in 1999, Dr. Goren stated "it wouldn't surprise [him] at
7  all" to learn that she was suffering from her current complaints in 1999.  Parks' attorney
8  asked Dr. Goren to assume that Parks was, in fact, suffering from all of her current
9  complaints in 1999 and to then determine if she was disabled at that time.  Dr. Goren stated
10 that, in his opinion, Parks would not have been disabled. (Tr. 51)  Dr. Goren believed that,
11 in light of the medical records from 1999, the only restrictions on Parks' work would have
12 been "no climbing ladders, ropes or scaffolds . . . [n]o balancing" and no "exposure to
13 hazards." (Tr. 49, 56)  When asked specifically about Parks' migraines in 1999, Dr. Goren
14 responded that he did not have information about migraines in 1999. (Tr. 50)  When pressed
15 on this point, Dr. Goren explained that "the impression [he got] from the record [was] that
16 [Parks'] treating physicians [were] not impressed with the severity or the frequency of the
17 headache." (Tr. 52)
18      The next witness was Linda W. Heiland, a vocational expert.  Ms. Heiland was asked
19 her opinion regarding two hypothetical situations.  First, whether Parks would have been able
20 to perform any of her past relevant work in light of the restrictions mentioned by Dr. Goren.
21 Ms. Heiland stated that "[a]ll of [Parks'] past relevant jobs would be available." (Tr. 56)
22 Next, Ms. Heiland was asked regarding work possibilities if an "individual were to miss four
23 or more days of work per month."  Ms. Heiland agreed with the ALJ's opinion that "no work
24 [would be] available for that special accommodation." (Tr. 56)  Parks' counsel asked Ms.
25 Heiland about the impact of Parks' migraines.  If Parks' testimony was "taken as fully
26 credible" then the migraines "would effectively rule out all work." (Tr. 57)  Also, Ms.
27 Heiland agreed that if Parks needed "a half-hour nap in the morning and half-hour nap in the
28 afternoon in addition to lunch break," she would not be employable.

In his written decision, the ALJ recounted the following findings regarding Parks' health. In February 1999 Parks complained to her doctor of dizziness. (Tr. 328) In June 1999 Parks underwent two surgeries for abdominal pain and nausea. On July 8, 1999, one of Parks' doctor observed in a post-operative checkup that Parks was "doing well." (Tr. 175) Parks was also evaluated in June 1999 due to complaints regarding dizziness. Parks reported that the dizziness would last "from three hours to a day and may happen about five out of seven days a week." (Tr. 180) The doctor chose to change her prescriptions in an attempt to alleviate the dizziness. (Id.) Parks was next seen on September 20, 1999 due to five days of abdominal pain. She was provided with medication and told to followup in seven days. (Tr. 178) On October 11, 1999, Parks went to the doctor due to pain on her left side. Her condition started after she traveled "back and forth to San Francisco within 10 days and she was the driver on both trips." (Tr. 472) She was provided with two prescriptions and told to follow-up. (Id.) On October 21, 1999 Parks was seen again for pain in both sides of her back after she lifted a heavy laundry basket. She was diagnosed with a lumbar sprain. (Tr. 470) Parks also underwent cataract surgery in October 1999. Parks' treating physician wrote a letter on October 28, 2003 summarizing the state of Parks' health in 1999. The physician stated that "[Parks] has had continuous abdominal pain, diarrhea, fatigue, depression, and anxiety since her multiple hospitalizations in 1999" and that the "episodes of Gastric pain throughout the year of 1999 . . . prevented her from working." (Tr. 422)

After considering this medical history, as well as the testimony of Dr. Goren and Ms. Heiland, the ALJ concluded that "the record supports a conclusion that [Parks could] perform work . . . through December 31, 1999. No treating or examining physician . . . provided evidence that the claimant was unable to perform substantial gainful activity for any period of 12 continuous months, because of any impairment or combination of impairments." (Tr. 19) The ALJ adopted the opinion of Dr. Goren that Parks had not been disabled. Also, the ALJ found Parks' "subjective complaints that she is unable to work are not fully accepted to the extent alleged. Her complaints and alleged limitations are out of proportion to the evidence during the period in question. Her testimony was more applicable to the period

- 4 -

1 after the date she was last insured for benefits and many of her impairments were not
2 documented at all during [1999]." (Tr. 19) Accordingly, the ALJ found that during 1999
3 Parks could perform her previous work and that she was not entitled to disability benefits.
4 (Tr. 19)

## ANALYSIS

6 The Court reviews the denial of benefits under a deferential standard of review. A
7 "decision to deny benefits will be disturbed only if it is not supported by substantial evidence
8 or it is based on legal error." Magallanes v. Bowen, 881 F.2d 747, 750 (9th Cir. 1989)
9 (quotations omitted). "Substantial evidence means more than a mere scintilla, but less than
10 a preponderance. It means such relevant evidence as a reasonable mind might accept as
11 adequate to support a conclusion." Id. (quotations omitted). Where the evidence presented
12 to the ALJ "is susceptible to more than one rational interpretation, it is the ALJ's conclusion
13 that must be upheld." Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005). The ALJ is also
14 "responsible for determining credibility and resolving conflicts in medical testimony."
15 Magallanes, 881 F.2d at 750. In this case, Parks argues that the ALJ committed legal error
16 by not giving adequate weight to Parks' treating physician's testimony. Parks also believes
17 that Dr. Goren's testimony was so flawed that it was error for the ALJ to rely on it.
18 According to Parks, once Dr. Goren's testimony is disregarded, it is clear that substantial
19 evidence does not support the ALJ's conclusion. Finally, Parks argues that allowing a
20 medical expert to testify telephonically violated her due process rights. Each of Parks'
21 arguments are addressed below.

22 **A. Proper Weight to Parks' Physician**

23 To prevail on her claim for disability benefits, Parks had to "show that [her] current
24 disability has existed continuously since some time on or before the date that [her] insured
25 status lapsed." Flaten v. Sec'y of Health & Human Servs., 44 F.3d 1453, 1458 (9th Cir.
26 1995). The parties agree that Parks was insured for disability through December 31, 1999.
27 Therefore, Parks is not entitled to benefits if she is unable to work due to ailments with an
28 onset date later than December 31, 1999. Id. Parks submitted a 2003 letter from her treating

1 physician stating that her current ailments could be traced back to 1999 and that Parks' 2 gastric pain during 1999 prevented her from working. Because this letter came from Parks' 3 treating physician, Parks' believes it should have been given more weight by the ALJ.

4 Parks is correct that a court must "afford greater weight to a treating physician's 5 opinion." Magallanes, 881 F.2d at 751. The treating physician has a "greater opportunity 6 to know and observe the patient as an individual." Sprague v. Bowen, 812 F.2d 1226, 1230 7 (9th Cir. 1987). "The treating physician's opinion is not, however, necessarily conclusive as 8 to either a physical condition or the ultimate issue of disability." Magallanes, 881 at 751. 9 To reject the opinion of a treating physician, the ALJ must "make findings setting forth 10 specific, legitimate reasons for doing so that are based on substantial evidence in the record." 11 Id. (quotations omitted). This burden is met when the ALJ sets "out a detailed and thorough 12 summary of the facts and conflicting clinical evidence, stat[es] his interpretation thereof, and 13 mak[es] findings." Id. (quoting Cotton v. Bowen, 799 F.2d 1403, 1408 (9th Cir.1986). The 14 ALJ met these requirements.

15 In his written opinion, the ALJ provided a detailed summary of the facts as well as the 16 conflicting opinions of Parks' treating physician and Dr. Goren. The ALJ specifically found 17 that the treating physician's claim that Parks was disabled in 1999 was not supported by the 18 physician's "objective findings" elsewhere in the record. (Tr. 19) Specifically, there was no 19 indication in the record that Plaintiff had suffered from a disabling condition for twelve 20 months. Because the ALJ found that the treating physician's opinion was not supported by 21 the evidence presented, the ALJ concluded that there was no evidence, from the treating 22 physician or any other source, that Parks had been "unable to perform substantial gainful 23 activity for any period of 12 continuous months." (Id.) The ALJ also observed that Parks 24 alleged limitations were "out of proportion to the evidence." Specifically, there was no 25 evidence that Parks "was required to take extensive naps" during 1999, no evidence of 26 significant side-effects from medication during 1999, and Plaintiff was able to drive to 27 California during 1999. See Bunnell v. Sullivan, 947 F.2d 341, 346 (9th Cir. 1991) 28 (observing that an ALJ "may discredit the claimant's allegations based on inconsistencies in

- 6 -

1  the testimony or on relevant character evidence"). The ALJ fulfilled his duty when rejecting a treating physician's opinion to state his interpretation of the facts and make relevant findings. Accordingly, the ALJ did not err by rejecting the treating physician's opinion.[2]

## B. Substantial Evidence

Parks' second argument is that Dr. Goren's testimony was inconsistent with the record, indicating that he did not conduct a fair and complete review of the record. Parks believes that due to inconsistencies between the record and Dr. Goren's testimony, "the ALJ should have given [Dr. Goren's] testimony no weight." (Motion for Summary Judgment at 9) This argument overstates the conflict between the record and Dr. Goren's testimony.

Parks believes Dr. Goren's testimony regarding her migraines was inconsistent with her medical records. Parks points to four medical records referencing Parks headaches/migraines in 1999. A medical record from March 30, 1999 included a diagnosis of headaches. (Tr. 196) The record does not indicate what, if any, treatment plan was recommended at that time. Other records from June 1999 indicate a diagnosis of migraine headaches, but those records also indicate that Parks' migraines were "currently stable with approximately one headache every one to two weeks." At that time Parks was apparently treating her headaches with "good success." (Tr. 136)

When initially asked by the ALJ to describe Parks' medical impairments Dr. Goren stated that he had "no notes from 1999 about [headache.]" (Tr. 48) When Parks' attorney asked about migraine headaches Dr. Goren responded that "I don't have information about migraine in 1999." (Tr. 50) Parks believes these statements show that Dr. Goren did not adequately review her record. But later statements by Dr. Goren show that he was aware of the relevant medical records.

---

[2] The ALJ also could have rejected the treating physician's opinion as a conclusory retrospective opinion. See Johnson v. Shalala, 60 F.3d 1428, 1432 (9th Cir. 1995) (affirming ALJ rejection of treating physician's retrospective opinion).

- 7 -

Dr. Goren stated in his testimony that in 1999 Parks "[u]ndoubtedly . . . had spine pain, had headache, had carpal tunnel syndrome. Undoubtedly." But Dr. Goren's reading of the record led him to believe "that [Parks'] treating physicians [were] not impressed with the severity or the frequency of the headache or the spine pain." Dr. Goren believed that more would have appeared in the record if Parks had actually suffered from headaches "with the frequency and/or severity that she described in testimony." Viewing the entire transcript of Dr. Goren's testimony, therefore, it is clear that he was aware of Parks' complaints in 1999 regarding her migraines; he simply believed that there would have been more evidence if the migraines were as debilitating as Plaintiff claimed.

Parks also cites Dr. Goren's failure to accurately assess the impact of her abdominal surgeries coupled with her other medical complaints in 1999 as evidence of his misunderstanding of the record. But Dr. Goren's testimony made clear that he was aware of Parks' various complaints in 1999. (Tr. 48-49, discussing vertigo, surgeries, and cataracts) There is ample evidence in the record that Dr. Goren's opinion was based on a full review and understanding of Parks' medical history. Therefore, it was not error for the ALJ to rely on Dr. Goren's testimony.

**C. Due Process**

Parks' final argument is that the ALJ infringed on her due process rights by allowing Dr. Goren to testify via telephone. According to Parks, Dr. Goren should be considered an "adversary" and "her due process rights were violated by not being able to see her 'accuser' or validate [that] the voice on the phone [was], in fact, the voice of a medical expert." (Motion at 10) At the hearing, neither Parks nor her attorney objected to the ALJ allowing Dr. Goren to appear telephonically. In fact, rather than objecting to the telephonic testimony, Parks' attorney chose to stipulate to Dr. Goren's qualifications. (Tr. 48) Parks cites no case law or other authority in support of her due process argument. Thus, the exact basis for her argument is unclear. Parks may be asserting that the Sixth Amendment mandates she be "confronted with the witnesses against [her]." The Tenth Circuit, however, has held that because the Sixth Amendment applies only to criminal proceedings, testimony via telephone

at an administrative hearing does "not transgress Sixth Amendment prescriptions regarding confrontation of witnesses." <u>Peretti v. Nat'l Transp. Safety Bd. F.A.A.</u>, 999 F.2d 548 (10th Cir. 1993) (unpublished disposition).[3] The Court agrees with this conclusion that there is no Sixth Amendment violation when an ALJ allows testimony via telephone. Alternatively, Parks may be asserting a general due process right to confrontation of all adverse witnesses. The Court is unaware of any authority supporting such a right. <u>See</u> Fed. R. Civ. P. 43(a) (allowing for testimony via telephone in certain circumstances). Parks' argument regarding due process is rejected.

Accordingly,

IT IS ORDERED that Parks' Motion for Summary Judgment (Doc. 4) is DENIED.

IT IS FURTHER ORDERED that Defendant's Cross-Motion for Summary Judgment (Doc. 7) is GRANTED.

DATED this 17th day of January, 2006.

_____
Roslyn O. Silver
United States District Judge

---

[3] Tenth Cir. R. 36.3 (allowing citation of unpublished dispositions).

- 9 -